UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

FLORIDA DEVELOPMENT ASSOCIATES
LTD., a Florida limited partnership,

Debtor.

Case No.: 04-12033-BKC-AJC
04-12034-BKC-AJC
04-12035-BKC-AJC
Chapter 11 Proceedings

Jointly Administered

_____/

FLORIDA DEVELOPMENT ASSOCIATES
LTD., a Florida limited partnership,

Plaintiff,

Adv. Case No.

v.

KNEZEVICH AND ASSOCIATES, INC., a
Florida corporation, THORNTON TOMASETTI,
INC., f/k/a THE THORNTON-TOMASETTI
GROUP, INC., a foreign corporation, DDA
ENGINEERS, P.A., f/k/a DONNELL,
DUQUESNE & ALBAISA, P.A., a Florida
professional association, DESIMONE CONSULTING
ENGINEERS, LLC, a foreign limited liability
company, JOHN V. KNEZEVICH, an individual,
RAMON DONNELL, an individual, RAUL
GONZALEZ, an individual, WILLIAM R.
O'DONNELL, an individual, and STEVEN M.
GOLDSTEIN, an individual,

Defendants.

_____/

## ADVERSARY COMPLAINT

COMES NOW the Plaintiff, FLORIDA DEVELOPMENT ASSOCIATES, LTD. (hereinafter

"FDA"), by and through its undersigned counsel, and sues the Defendants, KNEZEVICH &

ASSOCIATES, INC., (hereinafter "Knezevich & Associates"), THORNTON TOMASETTI, INC.,

f/k/a THE THORNTON TOMASETTI GROUP, INC., (hereinafter "TTG"), DDA ENGINEERS,

P.A., f/k/a DONNELL DUQUESNE & ALBAISA, P.A., (hereinafter "DDA"), DESIMONE

CONSULTING ENGINEERS, LLC, (hereinafter "DeSimone"), JOHN V. KNEZEVICH,

(hereinafter "Knezevich"), RAMON DONNELL, (hereinafter "Donnell"), RAUL GONZALEZ,

(hereinafter "Gonzalez") WILLIAM R. O'DONNELL, (hereinafter "O'Donnell"), and STEVEN M.

GOLDSTEIN (hereinafter "GOLDSTEIN"), and states as follows:

## I.  JURISDICTION AND VENUE

1.      This is an Adversary Proceeding filed pursuant to Federal Rule of Bankruptcy

Procedure 7001(1), et seq. and §§553.84 and §501.201, et seq., Florida Statutes (2007).

2.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C.

§ 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409 because the FDA's

Chapter 11 bankruptcy case is pending in this District.

## II. PLAINTIFF

4.      Plaintiff is a Florida limited partnership who was the owner and developer of the

Bentley Bay Condominium (hereinafter "Project"), containing two towers with a total of 168

condominium units along with appurtenant common elements.  Plaintiff hired Keystone Construction

Group, Inc. (hereinafter "Keystone") as the general contractor to build the Project.

5.      The instant causes of action concern defective design, inspection, and related

professional services provided to the Project by the Defendants pertaining to balcony railings and

curbs on the Project.

6.      Plaintiff brings this action to recover damages it incurred in replacing and/or

correcting the defective balcony railings and curbs, as well as for other related damages inuring to

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

Plaintiff arising from same.

### III. DEFENDANTS

7.      Knezevich & Associates was at all times material hereto the engineer of record for the design of the balcony railing system.

8.      TTG was at all times material hereto and based upon information and belief the successor in interest to Knezevich & Associates and furthermore was the engineer Plaintiff retained for forensic investigation when Plaintiff detected balcony railing failures. TTG was also involved in the design of the original balcony railing system.

9.      DDA was at all times material hereto the structural engineer of record for the Project, including, but not limited to, the design of the balcony railings and curbs and furthermore was the threshold inspector on the Project.

10.     DeSimone was at all times material hereto the special inspector for the balcony railing system and balcony curbs.

11.     Knezevich was at all times material hereto to a licensed engineer who designed the balcony railings and conducted the subsequent forensic investigation into the causes of the railing system failure. Knezevich worked initially for Knezevich & Associates when he initially designed the railings and subsequently for TTG when he prepared a field sketch for the balcony railings and when he conducted the subsequent forensic investigation.

12.     Donnell was at all times material hereto the licensed engineer who prepared, supervised, and/or signed and sealed the structural plans for the Project, including the balcony curb and approval of the balcony railing shop drawings. Donnell was employed by DDA on the Project.

13.     Gonzalez was at all times material hereto an engineer employed by DDA and

supervised by Donnell who approved the balcony railing shop drawings and, upon information and belief, participated in the structural design and threshold inspections on the Project.

14.     O'Donnell was at all times material hereto the licensed engineer at DeSimone who personally conducted and/or supervised special inspections as the Project's special inspector for the structure and balcony railings.

15.     Goldstein was at all times material hereto another licensed engineer at DeSimone who personally conducted and/or supervised special inspections as the Project's special inspector for the structure and balcony railings.

## IV. FACTS COMMON TO ALL COUNTS

16.     Plaintiff, in furtherance of its plans to develop the Bentley Bay Condominium, hired Keystone as its general contractor.  DDA, as structural engineer of record for the Project, through the services of its individual engineers, Donnell and Gonzalez, designed all structural elements and systems on the Project, including, but not limited to, the exterior balcony slabs.  DDA, Donnell and Gonzalez knew the balconies they were designing were intended to support a balcony railing system, which would in turn be designed by an engineer retained by the balcony railing subcontractor.  Many of the balcony slabs were designed to have a concrete curb located on the edge of the slabs, in which the balcony railings would be set.  Other slabs were to have the balcony railings installed directly into the slabs themselves without the need for concrete curbs.

17.     After DDA's initial structural design, Keystone hired AGR Fabrications International Group (hereinafter "AGR") to be the balcony railing subcontractor.  AGR in turn hired Knezevich & Associates, through its engineer Knezevich, to design the balcony railing system.  Based upon information and belief, Knezevich & Associates and Knezevich individually were provided with

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

DDA's structural plans, among other documents, for use in designing the balcony railing system. However, the balcony railing system Knezevich & Associates and Knezevich individually designed, as reflected in the shop drawings they created, was defective.  In particular, the South Florida Building Code in effect at the time of the Project required the balcony railings to withstand 110 mph winds.  However, due to the defective railing design by Knezevich & Associates and Knezevich individually, the balcony railings were not designed to meet the South Florida Building Code's requirements.  Among other reasons, the initial design for the balcony railings was defective because:

a.    the railing system was not designed to withstand a net wind load of + 90 psf, as required by the South Florida Building Code Section 2309, Section 6 of Standard 7-88  of the American Society of Civil Engineers, and the wind tunnel investigation performed by RWDI titled Final Report Cladding Wind Load Study / Mistral Towers Miami Beach, Florida dated August 21, 2000;

b.    the railing system was not designed to meet the standards required by the South Florida Building Code for buildings and structures in Exposure Category D, the wind load standards applicable to buildings on coastal barrier islands per §§ 2302.1 and 2309.1 of the Building Code;

c.    Knezevich & Associates and Knezevich individually applied a lower mean roof height than that reflected on the architectural drawings for the Project when designing the rails; and

d.    the testing results for the rails reflected a greater deflection than that permitted under the South Florida Building Code.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

18.     Knezevich & Associates and Knezevich individually presented their defectively designed shop drawings to DDA, who in turn approved same through their individual engineer Gonzalez, as supervised by Donnell, and the defectively designed balcony railing system was incorporated into the structural plans for the Project. DDA approved the defective shop drawings by affixing a stamp thereto representing that Knezevich & Associates and Knezevich individually understood DDA's structural design intent and used the specified criteria for same. This representation was false when made.

19.     After DDA's approval of the defective balcony railing shop drawings, Keystone and its subcontractor, AGR, began erecting the balcony railings. Keystone, through its shell subcontractor, also erected the concrete curbs on the edge of the balcony slabs into which many of the rails were to be installed. However, the curbs were not built in a proper manner to support the balcony railing system because the reinforcing steel (hereinafter "rebar") within the concrete curbs was placed in a manner that did not support the requirements of the balcony railing design. In particular, the rebar was set too deep from the top of the concrete curbs to provide the necessary support for the balcony railing posts. For this reason, the rebar placement in the curbs was insufficient to support the railing system as designed.

20.     Not only did Keystone fail to construct the balcony curbs according to the South Florida Building Code, but they also failed to install the balcony railings in a manner consistent with the approved shop drawings. In particular, Keystone failed to comply with the requirements of post height and embedment depth and size and spacing of top caps and clips. At no time was Plaintiff ever advised of the defective construction of either the balcony curbs or the railings.

21.     In the meantime, DeSimone, through its individual engineers O'Donnell and

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

Goldstein, had contracted with Keystone to act as the special inspectors for the structural work on the Project. Pursuant to that arrangement, DeSimone, O'Donnell and Goldstein agreed to conduct structural inspections on behalf of the City of Miami Beach Building Official to ensure compliance with the design documents and the South Florida Building Code. A true and correct copy of the contract between DeSimone and Keystone is attached hereto as Exhibit "A" and is hereby incorporated by reference. As a prerequisite to this engagement, the City of Miami Beach Building Department required O'Donnell and Goldstein to certify their responsibility for inspecting the structural elements of the Project, including all reinforced concrete such as the balcony curbs and all railings, to ensure compliance with the building plans and the applicable Building Code. DeSimone, O'Donnell, and Goldstein certified to the Building Department they would immediately notify the Building Official in the event of non-compliance with the plans or Building Code. A true and correct copy of the certification Goldstein provided to the Building Department in this regard is attached hereto as Exhibit "B" and is hereby incorporated by reference. While O'Donnell signed an identical certification binding himself to the same obligation as Goldstein, as reflected by the City of Miami Beach's records of extensive inspection reports O'Donnell filed, O'Donnell failed to produce a copy of his certification in response to a subpoena served upon him. Plaintiff will obtain a copy during discovery in this action.

22.    Thereafter, on February 26, 2003, Plaintiff separately contracted with DeSimone for the inspections of the balcony railing installation, although O'Donnell and Goldstein had already assumed that obligation as special inspectors through their certifications to the Miami Beach Building Department. A true and correct copy of the letter of authorization between Plaintiff and DeSimone is attached hereto as Exhibit "C" and is hereby incorporated by reference.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 ● TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

23.     Notwithstanding DeSimone's obligation to inspect and certify that the balcony curbs and railings were installed according to plans and the Building Code, DeSimone, through its individual engineers O'Donnell and Goldstein, failed to detect numerous material construction and design defects in both the railings and the curbs necessary to support the system. Additionally, they knew or reasonably should have detected and therefore should have known of other defects, but, instead of immediately notifying the Building Official as they were obligated to do under their special inspector certifications or notify Plaintiff, DeSimone, O'Donnell and Goldstein allowed the defective conditions to persist. All of this was unbeknownst to Plaintiff.

24.     During the course of construction, the railing subcontractor provided to Keystone Styrofoam block-outs intended to be set in the balcony slabs when the concrete was poured so the concrete could be poured around them, allowing the block-outs to create holes in the concrete in which the balcony railing posts could subsequently be embedded. Nevertheless, Keystone failed to install the block-outs or otherwise preserve spaces in the concrete balcony slabs in which the railing posts could be inserted. Therefore, after all balconies and curbs were poured, the concrete had to be cored to create holes for the balcony posts. In the process, the cores were not cut deep enough to ensure the railing posts were embedded as deep as required by the railing shop drawings (despite their defective design). Furthermore, when Keystone's subcontractor poured the balcony curbs, they placed the rebar too far below the top of the curbs to adequately stabilize the railing posts in the curbs. In many instances, the "top steel" (the uppermost rebar within the curbs) was actually below the deepest embedment point of the balcony railing posts, thereby vastly diminishing the lateral support the posts received from the rebar, contrary to the apparent design intent.

25.     Both DDA and DeSimone, through their individual engineers Donnell, Garcia,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

O'Donnell and Goldstein, became aware of these conditions during the balcony railing installation. Nevertheless, DDA, Donnell, Gonzalez DeSimone, O'Donnell and Goldstein approved these defects during all inspections in which they observed these conditions, notwithstanding noncompliance with the applicable Building Code and standards referenced therein. This was one of the factors that greatly compromised the structural integrity of the balcony railing system.

26.     By the time the lack of block-outs in the balcony slabs became apparent to the railing subcontractor, Knezevich & Associates was purchased by TTG and Knezevich began working for TTG. TTG thus became the railing subcontractor's engineer. In that capacity and in response to the lack of concrete block-outs for the railing posts, TTG issued shop drawings establishing the design criteria for installing the railings with surface mounts, by which the railing posts were mounted on top of the concrete slab, rather than the anticipated embedment of the posts into the slabs. By this time, TTG knew 1) the rail posts were not going to be embedded into the slabs as originally designed, and 2) the railing heights were going to be 43.5". In fact, TTG's revised sketch reflected railing heights of 43.5", instead of the 42" reflected in the original shop drawings. These factors should have caused TTG to realize a re-engineering of the railing system was required due to the changed installation parameters, yet TTG failed to do so when they submitted the new shop drawings for the surface mounted railing system. Therefore, although TTG's revised sketch dated October 20, 2004 acknowledged the new railing post height of 43.5", an increase from the original design by 1 ½", TTG still underdesigned the rail system by failing to re-engineer it to meet the required 90 psf standard for the railing posts. DDA approved TTG's shop drawings as structural engineer of record.

27.     On October 24, 2005, South Florida was hit by Hurricane Wilma, creating 80 mph winds, 30 mph less than the wind load requirements imposed by the Building Code for balcony

railings. Nevertheless, Hurricane Wilma's 80 mph winds destroyed large amounts of glass panels on the balcony railings and loosened and dislodged the balcony railing posts, cracking and spalling the concrete in which many of the posts were embedded, creating a severe life safety issue. In response to the system failure and subsequent Notice of Violation issued by the City of Miami Beach, Plaintiff immediately hired Knezevich, who at that time was still working for TTG, the successor company of Knezevich & Associates, to conduct a forensic investigation into the cause of the balcony railing failure and design the remedial work necessary to repair the rails. A true and correct copy of Plaintiff's contract with TTG for the forensic examination of the rails is attached hereto as Exhibit "D" and is hereby incorporated by reference.

28.    The contract between TTG and Plaintiff estimated a budget of $35,000 in fees plus expenses for TTG to develop a full understanding of the scope of the problems at the Project. However, Plaintiff ended up paying TTG $251,297.56, plus over $215,000 more to third parties for testing and related services requested by TTG as part of their forensic examination. During the forensic examination, TTG studied the balcony railing conditions and even built and subjected mockups of the railings to various load tests to ensure compliance with the building code standards for wind load resistance. However, TTG's mockups consistently failed all load tests to which they were subjected. In one instance, TTG built a mockup railing system, correcting all the installation defects originally performed by Keystone, and subjected the corrected mock-up to a load test at wind pressures greater than those actually experienced during the hurricanes at Bentley Bay. The corrected mock-up, with the field installation defects corrected, withstood the wind pressures, although those wind pressures were less than those required by the Building Code. That same corrected system subsequently failed to withstand the Building Code's required load of 110 mph.

This series of tests established that the railing system as originally designed failed to meet the requirements of the Building Code and was therefore defective, although it may have been strong enough had it been installed as designed to withstand the much lower wind loads caused by the hurricanes. Regardless of whether the railings would have withstood the hurricanes, they were defective according to the Code's requirements and would have had to be replaced once the latent defective design was discovered.

29.    Nevertheless, rather than properly explaining to Plaintiff the nature of the failure in the balcony railing system caused by the original defective design by Knezevich & Associates and Knezevich individually, Knezevich and TTG continued to charge Plaintiff exorbitant fees for continued tests and studies which, upon information and belief, were designed to try to find a way to justify the defective original design. In the end, TTG and Knezevich were unsuccessful. Plaintiff became concerned about the escalating fees with no apparent progress on the repairs and started to believe TTG and Knezevich were spending hundreds of thousands of dollars of Plaintiff's money to try to exonerate themselves from their own defective design. Upon learning of this, Plaintiff terminated its contract with TTG. Thereafter, it was determined the entire railing system had to be replaced rather than repaired, due to the defective design and the fact that a repaired system built to the original design would not meet the requirements of the South Florida Building Code. Plaintiff therefore hired a contractor to replace the railing system for the base contract price of $3,819,004.26.

30.    After the replacement contractor, National Concrete Preservation, commenced work on the balcony railing replacement, it quickly detected that the construction of the balcony curbs upon which most of the rails were to be installed was insufficient to support the railing system, as well as the insufficient depth of the balcony slabs themselves to sustain the required balcony post

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

embedment. This resulted in a change order to National Concrete Preservation to change the locations and embedment depths of the balcony railing posts at a cost of $709,455.80, a cost that could have been avoided had the balcony slabs and curbs been properly constructed. DDA, as engineer and threshold inspector, and DeSimone, as special inspector, were obligated to ensure compliant construction and detect potential problems, yet failed to do so.

31.    As a result of the above-foregoing, Plaintiff paid $5,168,198.59 for the balcony railing replacement and forensic testing, security services, and related expenses directly attributable to the defective design and inspection of the balcony railings and curbs.

32.    All conditions precedent to maintaining the instant action have occurred, been waived or been performed.

## V. COUNT I
## NEGLIGENCE AGAINST KNEZEVICH & ASSOCIATES AND KNEZEVICH

33.    Plaintiff adopts and re-alleges Sections I-IV of this Complaint.

34.    At all times material hereto, Knezevich & Associates, by itself and through its individual engineer, Knezevich, designed for final use the Project's balcony railing system and was under a duty to Plaintiff to use reasonable care in so doing.

35.    At all times material hereto, the Defendant, Knezevich & Associates, by itself and through its individual engineer, Knezevich, undertook and was under a duty to Plaintiff to design the Project's balcony railing system in accordance with the South Florida Building Code, the Project's plans and specifications, and proper design and engineering practices.

36.    The Defendants, Knezevich & Associates and Knezevich, were careless and negligent in designing the Project's balcony railing system because of their failure to comply with the requirements of the South Florida Building Code, maintain consistency with the proper and approved

construction plans, and failing to comply with good design and engineering practices.

37.     The Defendants, Knezevich & Associates and Knezevich, designed the Project's balcony railing system in a manner containing various defects and deficiencies, as set forth in the shop drawings prepared and submitted by said Defendants.

38.     The Defendants, Knezevich & Associates and Knezevich, performed their work in such a manner as to breach their duty of reasonable care to Plaintiff, thereby resulting in damages, necessitating repairs as well as removal and replacement of the balcony railing system.

39.     As a direct and proximate result of the aforesaid negligence of the Defendants, Knezevich & Associates and Knezevich, Plaintiff has been and will be required to expend large sums of money for the repair and replacement of the balcony railing system and related damages caused thereby.

WHEREFORE, the Plaintiff demands judgment against Knezevich & Associates and Knezevich for damages approximating $3.9 million plus additional costs of testing and related services, interest, and the costs of this action.

## VI. COUNT II
### VIOLATION OF §553.84, FLA. STAT., AGAINST KNEZEVICH & ASSOCIATES AND KNEZEVICH

40.     Plaintiff adopts and re-alleges Sections I-IV of this Complaint.

41.     Section 553.84, Fla. Stat., states:

> Notwithstanding any other remedies available, any person or party, in an individual capacity or on behalf of a class of persons or parties, damaged as a result of a violation of this part or the Florida Building Code, has a cause of action in any court of competent jurisdiction against a person or party who committed the violation.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

42.     The building permit covering the Project was issued by the City of Miami Beach on August 16, 1999 and, therefore, the design and construction of the Project was governed by the South Florida Building Code. §553.73, Fla. Stats., at the time of the Project recognized that Code as a state minimum building code, the violation of which would give rise to an action under §553.84.

43.     Knezevich & Associates and Knezevich designed the Project's balcony railing system with defects and deficiencies, reflected in their shop drawings, in violation of the South Florida Building Code and thereby in violation of Section 553.84, Fla. Stat.

44.     As a direct and proximate result of the violations of the South Florida Building Code and §553.84, Fla. Stat., by Knezevich and Knezevich & Associates, Plaintiff has been and will be required to expend large sums of money for the replacement of the balcony railings on the Project and related damages and expenses caused by the defects and deficiencies.

WHEREFORE, Plaintiff demands judgment against Knezevich & Associates and Knezevich for damages approximating $3.9 million plus additional costs of testing and related services , interest, and costs of this action.

### VII. COUNT III
### NEGLIGENCE AGAINST DDA, DONNELL AND GONZALEZ

45.     Plaintiff adopts and re-alleges Sections I-IV of this Complaint.

46.     At all times material hereto, DDA, by itself and through its individual engineers, Donnell and Gonzalez, negligently designed, supervised, and inspected the balcony slabs, upturn curbs and railings and approved the defective designs by Knezevich & Associates and TTG of the balcony railings. DDA, Donnell and Gonzalez were under a duty to Plaintiff to use reasonable care in their design, supervision, inspections and approvals on the Project.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

47.    At all times material hereto, DDA, by itself and through its individual engineers Donnell and Gonzalez, undertook and were under a duty to Plaintiff to design, supervise, inspect and approve the balconies and balcony railing systems on the Project in accordance with the South Florida Building Code, proper and approved plans, and proper design, engineering and construction practices.

48.    DDA, Donnell and Gonzalez were careless and negligent in designing, supervising, inspecting and approving the Project's balconies and railing systems by failing to ensure compliance with the South Florida Building Code, proper and approved construction plans, and good design, engineering and construction practices.

49.    DDA, Donnell and Gonzalez approved the defectively designed balcony railing system, negligently designed the balcony curbs, and approved the defective construction of the balcony railings and curbs on the Project.

50.    DDA, Donnell and Gonzalez performed their work in such a manner as to breach their duty of reasonable care to Plaintiff, thereby resulting in damages, including, but not limited to, the cost of repairing the resulting damage, as well as removal and replacement of the balcony railings.

51.    As a direct and proximate result of the aforesaid negligence of DDA, Donnell and Gonzalez, Plaintiff has been and will be required to expend large sums of money for the repair and replacement of the improvements on the Project and damages caused thereby.

WHEREFORE, the Plaintiff demands judgment against DDA, Donnell and Gonzalez for damages approximating $4.5 million plus additional costs of testing and related services, interest, and the costs of this action.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

## VIII. COUNT IV
## VIOLATION OF SECTION 553.84, FLA. STAT., AGAINST
## DDA, DONNELL AND GONZALEZ

52.    Plaintiff adopts and re-alleges Sections I-IV of this Complaint.

53.    Section 553.84, Fla. Stat., states:

> Notwithstanding any other remedies available, any person or party, in
> an individual capacity or on behalf of a class of persons or parties,
> damaged as a result of a violation of this part or the Florida Building
> Code, has a cause of action in any court of competent jurisdiction
> against the person or party who committed the violation.

54.    The building permit covering the Project was issued by the City of Miami Beach on

August 16, 1999 and, therefore, the design and construction of the Project was governed by the South

Florida Building Code.  §553.73, Fla. Stats., at the time of the Project, recognized that Code as a

state minimum building code, the violation of which would give rise to an action under §553.84.

55.    DDA, Donnell and Gonzalez approved Knezevich & Associates' and TTG's defective

designs of the balcony railing system, defectively designed the balcony curbs, and, as threshold

inspectors, approved construction of the balcony curbs in a manner insufficient to support the

railings in violation of the South Florida Building Code and therefore in violation of §553.84, Fla.

Stat.

56.    As a direct and proximate result of the violations of the South Florida Building Code

and §553.84, Fla. Stat., by DDA, Donnell and Gonzalez, Plaintiff has been and will be required to

expend large sums of money uninstalling and completely replacing the balcony railings on the

Project and related damages and expenses caused by the defects and deficiencies.

WHEREFORE, Plaintiff demands judgment against DDA, Donnell and Gonzalez for damages approximating $4.5 million plus additional costs of testing and related services , interest, and costs of this action.

### IX. COUNT V
### INDEMNITY AGAINST DDA, DONNELL AND GONZALEZ

57.     Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

58.     The Bentley Bay Condominium Association, Inc. (hereinafter "Association"), the not for profit condominium association managing the Bentley Bay Condominium developed by Plaintiff, served notice pursuant to Chapter 558, Fla. Stat., and otherwise filed a claim against Plaintiff in the instant bankruptcy proceedings for alleged defective construction and/or design of various elements of the Project.  Association's claim against Plaintiff is founded upon statutory warranties provided by a developer to a condominium association pursuant to §718.203, Fla. Stat.

59.     DDA, Donnell and Gonzalez, as structural engineers of record and threshold inspectors on the Project, were charged with the obligation of designing the structural elements of the Project in accordance with the requirements of the South Florida Building Code, proper and approved construction plans, and good design, engineering and construction practices.  They were further charged with conducting threshold inspections in a manner designed to ensure the Project was constructed in accordance with the South Florida Building Code, proper and approved plans, and proper design, engineering and construction practices.

60.     Plaintiff disputes Association's claim.  It is Plaintiff's position, as set forth in its Objections to Association's Claim filed in this Honorable Court, that Association's claim includes items outside the scope of any express or implied warranty, was borne out of Association's failure to perform routine maintenance, said claim includes items Plaintiff disclaimed in condominium

documents, and said claim includes items for which Plaintiff was not responsible, in addition to other defenses.

61. Although Plaintiff disputes Association's claim, if Plaintiff is found liable to Association, such liability is merely technical, derivative and constructive as a direct and proximate result of the negligent design and inspections of DDA, Donnell and Gonzalez.

62. As a result thereof, DDA, Donnell and Gonzalez are liable for all damages incurred by Plaintiff by virtue of Association's claim, including, but not limited to, attorney's fees and other defense costs Plaintiff incurred and will incur in defending Association's claim.

WHEREFORE, the Plaintiff demands judgment against DDA, Donnell and Gonzalez for damages arising from all elements of the Association's claim attributable to the negligent design and/or inspection by said Defendants plus attorney's fees and costs incurred and to be incurred in defending against Association's claim, interest and the costs of this action.

## X. COUNT VI
### NEGLIGENCE AGAINST DESIMONE, O'DONNELL AND GOLDSTEIN

63. Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

64. At all times material hereto, DeSimone, by itself and through its individual engineers, O'Donnell and Goldstein, inspected and approved Keystone's defective installation of the balcony railings and curbs. DeSimone, O'Donnell and Goldstein were under a duty to Plaintiff to use reasonable care in their inspections and approvals on the Project and certified to the building department that they would inspect these components for compliance with the building plans and the building code.

65. At all times material hereto, DeSimone, by itself and through its individual engineers, O'Donnell and Goldstein, undertook and were under a duty to Plaintiff to inspect and approve the

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

balcony curbs and railing systems on the Project in accordance with the South Florida Building Code and proper and approved plans.

66.    DeSimone, O'Donnell and Goldstein were careless and negligent in inspecting and approving the Project's balcony curbs and railing systems because of their failure to ensure compliance with the South Florida Building Code and proper and approved construction plans.

67.    DeSimone, O'Donnell and Goldstein approved the defective installation of the balcony curbs and railing system, despite various defects and deficiencies contained within same as set forth supra, or alternatively failed to detect same and prevent said defects and deficiencies.

68.    DeSimone, O'Donnell and Goldstein performed their work in such a manner as to breach their duty of reasonable care to Plaintiff, thereby resulting in damages, including, but not limited to, the cost of repairing the resulting damage, as well as removal and replacement of the balcony railings.

69.    As a direct and proximate result of the aforesaid negligence of DeSimone, O'Donnell and Goldstein, Plaintiff has been and will be required to expend large sums of money for the repair and replacement of the improvements on the Project and damages caused thereby.

WHEREFORE, Plaintiff demands judgment against DeSimone, O'Donnell and Goldstein for damages approximating $4.5 million plus additional costs of testing and related services , interest, and the cost of this action.

## XI. COUNT VII
### VIOLATION OF §553.84, FLA. STAT., AGAINST
### DESIMONE, O'DONNELL AND GOLDSTEIN

70.    Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

71.    Section 553.84, Fla. Stat., states:

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

> Notwithstanding any other remedies available, any person or party, in an individual capacity or on behalf of a class of persons or parties, damaged as a result of a violation of this part or the Florida Building Code, has a cause of action in any court of competent jurisdiction against the person or party who committed the violation.

72.    The building permit covering the Project was issued by the City of Miami Beach on August 16, 1999 and, therefore, the design, construction and inspection of the Project was governed by the South Florida Building Code. §553.73, Fla. Stats., at the time of the Project, recognized that Code as a state minimum building code, the violation of which would give rise to an action under §553.84.

73.    DeSimone, O'Donnell and Goldstein inspected and approved Keystone's defective construction of the balcony curbs and railing system in violation of the South Florida Building Code and therefore in violation of §553.84, Fla. Stat.

74.    As a direct and proximate result of the violations of the South Florida Building Code and §553.84, Fla. Stat., by DeSimone, O'Donnell and Goldstein, Plaintiff has been and will be required to expend large sums of money for the removal and complete replacement of the balcony railings on the Project, repairs caused by the defective curbs and related damages and expenses caused by the defects and deficiencies.

WHEREFORE, Plaintiff demands judgment against DeSimone, O'Donnell and Goldstein for damages approximating $4.5 million plus additional costs of testing and related services, interest, and costs of this action.

## XII. COUNT VIII
### INDEMNITY AGAINST DESIMONE, O'DONNELL AND GOLDSTEIN

75.    Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 ● TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

76.     The Bentley Bay Condominium Association, Inc. (hereinafter "Association"), the not for profit condominium association managing the Bentley Bay Condominium developed by Plaintiff, served notice pursuant to Chapter 558, Fla. Stat., and otherwise filed a claim against Plaintiff in the instant bankruptcy proceeding for alleged defective construction and/or design of various elements of the Project.  Association's claim against Plaintiff is founded upon statutory warranties provided by a developer to a condominium association pursuant to §718.203, Fla. Stat.

77.     DeSimone, O'Donnell and Goldstein, as special inspectors on the Project, were charged with the obligation of inspecting the structural elements and balcony railings of the Project in accordance with the requirements of the South Florida Building Code and proper and approved construction plans.

78.     Plaintiff disputes Association's claim.  It is Plaintiff's position, as set forth in its Objections to Association's claim filed in this Honorable Court, that Association's claim includes items outside the scope of any express or implied warranty, was borne out of Association's failure to perform routine maintenance, includes items for which warranties were disclaimed in condominium documents, and includes items for which Plaintiff was not otherwise responsible, among other defenses.

79.     Although Plaintiff disputes Association's claim for alleged defects, if Plaintiff is found liable to Association, such liability is merely technical, derivative and constructive as a direct and proximate result of the negligent inspections of DeSimone, O'Donnell and Goldstein.

80.     As a result thereof, DeSimone, O'Donnell and Goldstein are liable for all damages incurred by Plaintiff by virtue of Association's claim, including, but not limited to, attorney's fees and other defense costs incurred and to be incurred in defending against Association's claim.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 ● TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

WHEREFORE, Plaintiff demands judgment against DeSimone, O'Donnell and Goldstein for damages arising from all elements of the Association's claim attributable to the negligent inspections by said Defendants, plus attorney's fees Plaintiff incurred and will incur in defending against Association's claim, interest, and the costs of this action.

## XIII. COUNT IX
## BREACH OF CONTRACT AGAINST DESIMONE

81.     Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

82.     On or about February 24, 2003, Plaintiff and Desimone entered into a contract for the Project, pursuant to which Desimone would provide inspection services as special inspector, in accordance with §305 of the South Florida Building Code, for the handrail installations. A true and correct copy of the contract between Plaintiff and Desimone is attached hereto as Exhibit "C" and is hereby incorporated by reference.

83.     Desimone breached the contract by failing to fulfill Desimone's obligations as the special inspector of the handrail system, by, among other things, failing to detect the construction defects and violations of the Building Code in the construction and design of the rails.

84.     Plaintiff paid all sums to Desimone required for their compensation under the contract. However, Desimone failed to perform their part of the agreement by failing to detect the construction and design defects in the railings and fraudulently misrepresenting to the City of Miami Beach that the railings complied with the construction plans and the applicable Building Code. Plaintiff is entitled to recover damages for Desimone's breach of contract in the amount of all costs necessitated by the repair and/or replacement of the balcony railing system.

WHEREFORE, Plaintiff demands judgment against Desimone for damages in the amount of all sums paid for the repair and/or replacement of the balcony railing system, including

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD,  MIAMI, FLORIDA  33131 ● TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

corresponding costs of testing, design, consulting and all related services necessary to replace the system, plus interest and costs of this action and an award of prevailing party attorney's fees pursuant to paragraph B of Exhibit II to the contract, plus such other and further relief as this Honorable Court may deem just and proper.

## XIV. COUNT X
## NEGLIGENCE AGAINST TTG AND KNEZEVICH

85.    Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

86.    After Knezevich & Associates' initial design of the balcony railing system, TTG, by and through its individual engineer Knezevich, who originally worked for Knezevich & Associates, but went to work for TTG while the Project was being constructed, designed a surface mounted railing system in response to Keystone's failure to properly embed the railing posts into the balcony slabs as required by Knezevich & Associates' design.  TTG and Knezevich were under a duty to Plaintiff to use reasonable care in so doing.

87.    TTG and Knezevich undertook and were under a duty to Plaintiff to design the Project's surface mounted balcony railing system in accordance with the South Florida Building Code, the Project's plans and specifications, and proper design and engineering practices.

88.    TTG and Knezevich were careless and negligent in designing the Project's surface mounted balcony railing system because of their failure to comply with the South Florida Building Code, maintain consistency with the proper and approved construction plans, and failure to comply with good design and engineering practices.

89.    TTG and Knezevich designed the Project's surface mounted balcony railing system in a manner containing various defects and deficiencies, as set forth in the shop drawings prepared and submitted by said Defendants.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

90.     TTG and Knezevich performed their work in such a manner as to breach their duty of reasonable care to Plaintiff, thereby resulting in damages, necessitating repairs as well as removal and replacement of the balcony railing system.

91.     As a direct and proximate result of the aforesaid negligence of the Defendants, TTG and Knezevich, Plaintiff has been and will be required to expend large sums of money for the complete removal, repair and replacement of the balcony railing system and related damages caused thereby.

WHEREFORE, the Plaintiff demands judgment against TTG and Knezevich for damages approximating $3.8 million plus additional costs of testing and related services, interest, and the costs of this action.

## XV. COUNT XI
## BREACH OF CONTRACT AGAINST TTG

92.     Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

93.     On or about November 30, 2005, Plaintiff and TTG entered into a contract for the Project, pursuant to which TTG would provide investigative consulting services to evaluate the cause of damage to the balcony railing system revealed by Hurricane Wilma.  A true and correct copy of the contract between Plaintiff and TTG is attached hereto as Exhibit "D" and is hereby incorporated by reference.  Pursuant to Florida law, an implied term of said contract is a requirement for TTG to deal with Plaintiff in good faith in the performance thereunder.

94.     TTG breached the implied duty of good faith in performing under its contract.  TTG's forensic examinations and tests revealed that Knezevich & Associates, an entity purchased by TTG, and Knezevich, then an employee of TTG, defectively and negligently designed the balcony railing system in violation of the South Florida Building Code and industry standards.

95.    TTG failed and refused to disclose to Plaintiff its findings about the defective design of Knezevich & Associates and Knezevich.

96.    Rather than disclosing critical information revealed through its evaluations and tests about the defective design of the rails, TTG further breached the contractual duty of good faith by charging Plaintiff to conduct additional tests in an attempt to exonerate Knezevich & Associates and Knezevich from liability, without disclosing to Plaintiff TTG's true motive therefor. Instead, TTG misled Plaintiff into believing the additional investigations and tests, which consistently failed, were designed to determine the true cause of failure of the balcony railing system. TTG's failure and refusal to disclose to Plaintiff the negligent and defective design by Knezevich & Associates and Knezevich and the true purpose of the additional investigations and tests for which TTG was charging Plaintiff caused Plaintiff to continue to fund TTG's attempts to test the defective design and exonerate Knezevich & Associates and Knezevich. However, TTG was unsuccessful in exonerating those Defendants.

97.    Plaintiff paid all sums and gave all support requested by TTG for said continued forensic work. However, unbeknownst to Plaintiff, only a mere fraction of the investigation costs needed to be incurred because a simple review of the system combined with mathematical calculations would have been sufficient to reveal the futility of attempting to "repair" the defectively designed system. Plaintiff is entitled to recover damages for TTG's breach of the contractual duty of good faith and a refund of all sums paid to TTG or any third party retained at TTG's suggestion who performed testing or services as part of TTG's forensic examination to the extent said costs were incurred in TTG's attempt to exonerate Knezevich & Associates and Knezevich from liability.

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

WHEREFORE, Plaintiff demands judgment against TTG for damages in the amount of all sums paid for testing, design, consulting and any related service to exonerate Knezevich & Associates and Knezevich, plus interest and costs of this action.

### XVI. COUNT XII
### VIOLATION OF FLORIDA'S DECEPTIVE AND
### UNFAIR TRADE PRACTICES ACT AGAINST TTG AND KNEZEVICH

98.     Plaintiff adopts and re-alleges Sections I through IV of this Complaint.

99.     This is an action for unfair and deceptive trade practices pursuant to Florida's Deceptive and Unfair Trade Practices Act §§501.201, et seq., Fla. Stats.

100.     Section 501.204, Fla. Stat., declares unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

101.     Section 501.202, Fla. Stat., provides the Florida Deceptive and Unfair Trade Practices Act shall be construed liberally to promote certain policies, including to protect the consuming public and legitimate business enterprises from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

102.     Plaintiff is a consumer as defined in Florida's Deceptive and Unfair Trade Practices Act.

103.     Despite Plaintiff's contract with TTG, at all times material hereto, during the negotiations leading to that contract, and especially during the performance of services under that contract, Plaintiff dealt with Knezevich. Knezevich advised Plaintiff on the best way to forensically investigate the defects in the balcony railing system and recommended that Plaintiff pay TTG for those services. Knezevich was the engineer of record for the balcony railing system and, therefore,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

advised Plaintiff that he had a great deal of experience in the design and construction of balcony

railings and that he and his company would oversee and supervise the forensic investigation into the

reasons for the balcony railing failure. Being satisfied with Knezevich's apparent qualifications and

experience, Plaintiff executed the contract with TTG. At all times material hereto, Knezevich, who

signed the contract on TTG's behalf, was, based upon information and belief, the vice president of

TTG's LZA Technology Division and was therefore an officer and director of TTG. At all times

material hereto, Knezevich was a direct participant in dealings with Plaintiff on the Project.

104.    During the negotiations by TTG and Knezevich for Plaintiff's business, TTG and

Knezevich never informed Plaintiff that Knezevich had negligently and defectively designed the

balcony railing system. TTG and Knezevich further failed to tell Plaintiff during the performance

of TTG's work under the contract that tests being conducted, supervised, or directed by TTG and

Knezevich were revealing Knezevich's negligent and defective design of the original balcony railing

system on the Project. To the contrary, Plaintiff initially believed the railing system failure was the

result of Hurricane Wilma and it was not until later that Plaintiff even became aware of Keystone's

improper installation. However, even when Plaintiff became aware of the defective installation,

TTG and Knezevich convinced Plaintiff that TTG and Knezevich were engaging in extensive tests

and forensic investigation to determine the extent of Keystone's installation defects without ever

disclosing to Plaintiff that Knezevich's defective original design was preventing the immediate repair

of the defective installation.

105.    TTG and Knezevich misrepresented to Plaintiff that the construction defects by

Keystone were the sole and exclusive cause of the balcony railing failure without disclosing to

Plaintiff that the continued tests and forensic investigation, for which Plaintiff paid significant fees,

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

were designed to attempt to exonerate Knezevich from liability because it was determined that, had

the balcony railing system been constructed in accordance with Knezevich's design, it would still

have failed to meet the applicable building code requirements. Plaintiff relied to its detriment upon

the misrepresentations and failures to disclose by TTG and Knezevich by paying substantial sums

of money for continued tests and forensic investigations intended solely for TTG and Knezevich's

protection, rather than assessing construction defects.

106.    Predictably, Plaintiff's repair of the balcony railing system ended up becoming a

complete replacement of the system, resulting in expenditures of sums by Plaintiff exceeding its

budget for same and delays in construction. Plaintiff ultimately terminated TTG and Knezevich and

hired a new contractor and their engineer to design the complete replacement of the balcony railing

system originally designed by Knezevich.

107.    The conduct of TTG and Knezevich constitutes a violation of the Florida Deceptive

and Unfair Trade Practices Act.  TTG and Knezevich engaged in the trade or commerce of

supervising, directing, and conducting forensic investigation services for Plaintiff and failed to

advise Plaintiff that they were charging Plaintiff for tests and services necessary to attempt to

exonerate their own liability, as opposed to forensically diagnose construction defects and design

remedial measures. The misrepresentations and omissions by TTG and Knezevich implied they were

charging Plaintiff only for services and tests necessary to forensically diagnose the extent of

construction defects in the balcony railing system and the repairs necessary to correct those defects.

108.    Knezevich is individually liable for violations of the Florida Deceptive and Unfair

Trade Practices Act because he was a direct participant in the deceptive and unfair practices visited

upon Plaintiff and because the economic loss rule does not preclude actions against professionals

despite lack of privity of contract. In his negotiations with Plaintiff and the subsequent performance under TTG's contract, Knezevich was the key to everything. He was the original engineer of record, he was a principal of TTG, he was the principal individual supervising and directing TTG's services under the contract, he was the one with the expertise to supervise, direct and conduct the forensic investigations and testing and he was the one who attempted to exonerate his own liability surreptitiously without informing Plaintiff of his true motives. Plaintiff believed Knezevich was acting in Plaintiff's best interest and it was that belief that induced Plaintiff to enter into the contract with TTG. At all times material hereto, Knezevich was a direct participant in the dealings with Plaintiff.

109.    Misrepresentations by TTG, Knezevich and staff working for both of them and/or made at the directions of TTG and Knezevich induced Plaintiff to pay all of TTG's fees plus all further testing and related services for the forensic investigation, resulting in overstated and unearned fees paid to TTG that were unnecessary for TTG's scope of work, identified as forensic investigation of construction defects in the balcony railing system.

110.    Plaintiff has since learned the work performed by TTG and Knezevich and the fees Plaintiff paid therefor were in fact unnecessary, overstated and invalid. As a result, Plaintiff paid TTG, testing services, contractors and others much more money than the amount they should have paid for an accurate diagnosis of Keystone's construction defects and paid TTG and Knezevich fees for attempts to exonerate themselves from liability in amounts far exceeding the amounts Plaintiff should have otherwise paid.

111.    TTG and Knezevich knowingly sent inaccurate and overstated invoices to Plaintiff for payment and incurred inaccurate and overstated fees from testing and related services and

contractors, while falsely and materially misrepresenting to Plaintiff the need for said sums and the work performed in exchange therefor or, alternatively, failing to disclose the true purpose for said work. Therefore, TTG and Knezevich made material misrepresentations and/or omissions inducing Plaintiff to pay sums not validly due and owing on the Project.

112.    TTG and Knezevich have engaged in trade or commerce as stated herein and as defined in Florida's Deceptive and Unfair Trade Practices Act.

113.    TTG and Knezevich have engaged in deceptive acts involving trade or commerce under Florida's Deceptive and Unfair Trade Practices Act, including, but not limited to, representations, omissions and practices likely to mislead consumers, such as Plaintiff, acting reasonably under the circumstances, to their detriment.

114.    TTG and Knezevich have engaged in unfair practices involving trade or commerce under Florida's Deceptive and Unfair Trade Practices Act, including, but not limited to, matters offending established public policy and that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, such as Plaintiff.

115.    As a direct and proximate result of the aforedescribed unconscionable and unfair practices and deceptive acts, misfeasance, malfeasance and/or negligence of TTG and Knezevich, Plaintiff has been actually aggrieved and has actually suffered damages.

WHEREFORE, Plaintiff demands judgment against TTG and Knezevich for compensatory damages in the amount of all sums paid for testing and investigation services designed to exonerate

LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.

3000 WACHOVIA FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA 33131 • TELEPHONE (305) 358-6363

Firm Clients\1870\1870-9\00425953.WPD.

Knezevich, attorney's fees pursuant to §§501.2105 and 501.211, Fla. Stats., prejudgment interest,

costs, and such other and further relief as this Honorable Court deems just and proper.

Dated: June 10, 2008.

<table>
<tr>
<td>

Lee A. Weintraub[1]<br>
Florida Bar No. 940704<br>
lweintraub@becker-poliakoff.com<br>
BECKER & POLIAKOFF, P.A.<br>
3111 Stirling Road<br>
Fort Lauderdale, Florida 33312<br>
Phone: 954-985-4147<br>
Fax: 954-985-4176<br>
<br>
<br>
Co-Counsel for Plaintiff

</td>
<td>

s/ Peter D. Russin<br>
Peter D. Russin, Esquire<br>
Florida Bar No. 765902<br>
prussin@melandrussin.com<br>
MELAND RUSSIN & BUDWICK, P.A.<br>
3000 Wachovia Financial Center<br>
200 South Biscayne Boulevard<br>
Miami, Florida 33131<br>
Telephone: (305) 358-6363<br>
Telecopy: (305) 358-1221<br>
<br>
Co-Counsel for Plaintiff

</td>
</tr>
</table>

---

[1] I hereby certify that the undersigned counsel is appearing pro hac vice in this matter pursuant to court order dated June 9, 2008 (CP #2231).

Firm Clients\1870\1870-9\00425953.WPD.

10/03/01  WED 17:56 FAX 3054479023        DeSimone Consulting Er                    ☺001

# DESIMONE CONSULTING ENGINEERS, P.L.L.C.

August 23, 2001, REVISED October 3, 2001

Mario Morales
Project Manager
Keystone Construction Group, Inc.
8181 NW 14th Street, Suite 200
Miami, FL 33126

RECEIVED
10.03.01

Re:    The Bentley Bay, 540 West Avenue, Miami Beach
       Special Inspector Services
       DCE Proposal No.: 1585

3833

Dear Mr. Morales:

As requested, please find enclosed our Proposal to provide Special Inspection services for The Bentley Bay project. DCE will assume the role of Special Inspector as defined in sections 305.3 and 401 of the South Florida Building Code. As such, we directly represent the City of Miami Beach Building Official.

Should you decide to engage our firm to provide these services, we will need to submit forms to both the City of Miami Beach and the Miami-Dade Board of Rules and Appeals. This normally takes one day, provided that Philip Azan is available for his signature. After these forms are submitted, we can then commence the inspection work.

We look forward to working with you.

Yours very truly,

William R. O'Donnell

William R. O'Donnell, P.E.
Executive Vice President

WOD/dhm

Enclosures

2600 DOUGLAS ROAD, SUITE 900, CORAL GABLES, FL 33134   (305) 441-0755   FAX (305) 447-9023

WILLIAM R. O'DONNELL, P.E.          VINCENT J. DESIMONE, P.E., FACI          BORYS L. HAYDA, P.E.
EXECUTIVE VP                        CEO                                      EXECUTIVE VP
STEVEN M. GOLDSTEIN, P.E.           CARLOS M. DOBRYN, P.E., FACI, NYAS       STEPHEN V. DESIMONE, P.E.
VP                                  PRESIDENT                                EXECUTIVE VP

EXHIBIT A

10/03/01  WED 17:56 FAX 30544~~023    DeSimone Consulting En    ☑002

# DCE

## EXHIBIT I

### A.    PROJECT DESCRIPTION

Two residential towers with associated common areas will be constructed on the north side of McArthur Causeway overlooking Biscayne Bay. The towers are similar in height with the tallest being 26 stories. Total building area is reported to be approximately 500,000 square feet. Construction has already commenced.

The north tower is expected to be completed at the end of March, 2002. The south tower will follow shortly thereafter in mid-April, 2002. The podium structure, including the parking garage, will be constructed within the same time frame.

### B.    SCOPE OF STRUCTURAL THRESHOLD INSPECTION SERVICES

Our engineering personnel will perform the Special Inspector Services in accordance with the South Florida Building Code, Section 305.

~~Our anticipation is that the project will require one full-time DCE inspector. In this manner, The Bentley Group will only pay for the times not hours spent on-site and not for travel to and from the project.~~ DCE will provide CLIENT with a part-time inspector that will service the project as needed to comply with the requirements of the City of Miami Beach Building Official. At this time, CLIENT anticipates that approximately 20 hours per week will be required. The manpower requirement will be tailored to meet the project schedule and demands as required. We will use our inspectors presently working on other South Beach projects as much as possible to limit travel time. Additional inspection personnel will be available on an as-needed basis. This may be required if the podium construction pace interferes with inspection of the towers.

DCE will advise CLIENT of additional testing services required to meet the requirements of the Threshold Inspection Plan, as prepared by the Engineer-of-Record. These services will be contracted by CLIENT. Examples of these services are bolt and weld inspections if required, concrete cylinder testing, surveying services, review of shoring, and inspections of window, sliding glass door, and railing installations.

### C.    FEES

With a long term commitment to hourly services, as Special Inspection projects are, we will discount the hourly rates given in our standard schedule of fees provided in Exhibit II. ~~Based upon a remaining structural construction period of eight months equating approximately~~

10/03/01  WED 17:56 FAX 3054477023          305 534 5531        P.4
                                  DeSimone Consulting En          ☒003

# DCE

THE BENTLEY BAY
SPECIAL INSPECTION SERVICES                          PAGE 3 OF 9
DCE PROPOSAL NO. 1585

---

~~1,280 hours, the anticipated total billing is approximately one hundred ten thousand dollars~~
~~($110,000).~~ Inspections are based upon a base hourly rate of eighty-five dollars ($85). The
hourly rate is based upon services provided during a normal 40-hour workweek. Inspections
requested on weekends, holidays, or beyond a normal 8-hour workday will be invoiced with a
1.5 multiplier.

~~If it appears that the maximum anticipated fee will be exceeded, we will inform you of the~~
~~circumstances and proceed only upon receipt of your written authorization.~~ Frequent
reinspection of other contributing factors requiring excessive DCE involvement will be
reported promptly to CLIENT. We will work with you to minimize the total number of
hours invoiced. It is very likely that we can taper off the hours as the completion date
approaches. CLIENT is only responsible for timesheet hours required to satisfy the Building
Official's requirements including but not limited to field inspections, report preparation, and
filing of reports as required. CLIENT is not responsible for timesheet hours due to holidays,
rain days, or personal illness days.

The fees will be invoiced to you on a monthly basis. Any required part-time inspection time
will accrue based upon actual time spent on this task including travel time from and to our
office with no minimums. Transportation or commuting time is not charged for full time on-
site inspectors. We will require site office space sufficient for the inspector, as well as access
to telephone, fax, and xerox equipment. Reimbursable costs such as prints, facsimiles, plots,
messenger fees, film processing and development, long distance communication, travel and
transportation, etc. will be charged at cost.

D.    **ADDITIONAL SERVICES**

Should additional services be required by you or by circumstances beyond our control, we
will, upon your written authorization, invoice you in accordance with our standard fee
schedule provided in Exhibit II.

E.    **ATTACHMENTS**

1.    Exhibit II

THE BENTLEY BAY                                DCE                                    PAGE 4 OF 9
SPECIAL INSPECTION SERVICES
DCE PROPOSAL NO. 1585

---

The parties have caused the **AGREEMENT** to be executed by their duly authorized representatives, as follows:

KEYSTONE CONSTRUCTION                    DeSimone Consulting Engineers, P.L.L.C.
GROUP, INC.

Signature                                Signature

Name _Richard Reyes_                     Name  William R. O'Donnell, P.E.

Title _Proj. Coord._                     Title   Executive Vice President

Date _10/05/01_                          Date    October 3, 2001

10/03/01   WED 17:57 FAX 3054/˙˙923        DeSimone Consulting Er                    @005

# DCE

---

## EXHIBIT II

### AGREEMENT

Between ("CLIENT")        Keystone Construction Group, Inc.
                          8181 NW 14th Street, Suite 200
                          Miami, FL 33126

And ("DCE")               DeSimone Consulting Engineers, P.L.L.C.
                          2600 Douglas Road, Suite 900
                          Coral Gables, Florida 3: 134

## FOR STRUCTURAL ENGINEERING CONSULTING SERVICES

Date:                     August 23, 2001, REVISED October 3, 2001

Project:                  The Bentley Bay, 540 West Avenue, Miami Beach, Florida
                          Special Inspector Services

### A.   SCOPE OF SERVICES

DCE will perform for **CLIENT** the consulting services described in **EXHIBIT I**, attached and incorporated into this **AGREEMENT**. Any modifications to the scope of services shall be in writing and signed by authorized representatives of **CLIENT** and **DCE**.

### B.   COMPENSATION AND PAYMENT

As full consideration, **DCE** compensation for the performance of services described herein shall be as provided for in **EXHIBIT I**, attached and incorporated into this **AGREEMENT**. The **CLIENT** recognizes that time is of the essence with respect to payment of **DCE's** invoices, and that timely payment is a material part of the consideration of this **AGREEMENT**.

**DCE** shall submit monthly invoices to **CLIENT**. **CLIENT** shall pay each invoice within thirty (30) calendar days of the date of the invoice. **CLIENT** shall pay an additional charge of one percent (1%) of the amount of the invoice per month or the maximum percentage allowed by law, whichever is the lesser, for any payment received by **DCE** more than thirty (30) calendar days from date of invoice. If **CLIENT** reasonably objects to any sum charged, **CLIENT** shall notify **DCE** within fourteen (14) calendar days of invoice date and pay the remaining undisputed portion of the balance when due. The parties will negotiate in good

Oct 03 01 12:20p    Bentley Bay                305 534 5531                p.7
10/03/01  WED 17:58 FAX 3054    723        DeSimone Consulting EL                      ☑006

# DCE

THE BENTLEY BAY
SPECIAL INSPECTION SERVICES                                          PAGE 6 OF 9
DCE PROPOSAL NO. 1585

faith as to any charges to which CLIENT so objects. In the event of a legal action brought by DCE against CLIENT for invoice amounts not paid, attorneys' fees, court costs, and other related expenses shall be paid to the prevailing party by the other party. Additionally, should payment of DCE invoices not be maintained on a thirty (30) day current basis, DCE may, by fourteen (14) calendar days written notice to CLIENT, suspend or terminate this AGREEMENT as provided in Section L.

### C.    CONSTRUCTION PROCEDURES

DCE shall not specify construction procedures, manage or supervise construction, or implement or be responsible for health and safety procedures; and shall not be responsible for the acts or omissions of contractors or other parties on the project; and shall not have control or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs. DCE field visits or inspections of portions of the work of other parties on a project shall not relieve such other parties from their responsibility for performing their work in accordance with applicable plans and specifications.

### D.    PROFESSIONAL RESPONSIBILITY

DCE services shall be performed in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants under similar circumstances. No other representations to CLIENT, expressed or implied, and no warranty or guarantee is included or intended in this AGREEMENT, or in any report, opinion, document, or service performed by DCE as a result of this AGREEMENT.

### E.    RISK ALLOCATION

The CLIENT recognizes that DCE's fee includes allowance for funding a variety of risks which affect DCE by virtue of agreeing to perform services on the CLIENT's behalf. DCE has allocated the risks such that the CLIENT agrees that to the fullest extent permitted by law, DCE's total liability to the CLIENT for any and all injuries, claims, losses, expenses, damages, or claim expenses arising out of this AGREEMENT from any cause or causes shall not exceed the limit of available professional liability insurance proceeds in place. Such causes include but are not limited to DCE professional negligence, errors, omissions, strict liability, breach of contract or breach of warranty. CLIENT shall recognize the State of Florida Statute of Limitations and Statute of Repose as is pertains to DCE's liability.

10/03/01   WED 17:58 FAX 3054⁄   123        DeSimone Consulting Er                    ☑007

# DCE

**THE BENTLEY BAY**
**SPECIAL INSPECTION SERVICES**
**DCE PROPOSAL NO. 1585**

In no event shall either **DCE** or **CLIENT** be liable for consequential damages including, without limitation, loss of use or loss of profits, incurred by one another or their subsidiaries or successors, regardless of whether such claim is based upon alleged breach of contract, willful misconduct, or negligent act or omission, whether professional or non-professional, of either of them or their employees, agents, or subcontractors.

**DCE** shall not be liable for damage or injury arising from damage to existing subterranean structures or installations that are not called to **DCE**'s attention and correctly shown on the plans furnished by **CLIENT**, in connection with work performed under this **AGREEMENT**.

The **CLIENT** acknowledges that **DCE** cannot and shall not be requested to provide services related to "Hazardous Substances", such as asbestos, PCB's, contaminated soils and the like.

**F.    INDEMNIFICATION**

Should any claim be brought against **DCE** by **CLIENT** or by any third party including, without limitation, any insurer asserting subrogation rights of **CLIENT**, relating to services under this **AGREEMENT**, **CLIENT** shall indemnify **DCE** for all legal fees, consulting fees, including those of **DCE**, and other costs of defense reasonably incurred by **DCE** except to the extent found by a court or forum to be attributable to the negligent errors or omissions of **DCE**.

**G.    SUSPENSION OR TERMINATION**

The **CLIENT** or **DCE** may suspend or terminate this **AGREEMENT** by fourteen (14) calendar days written notice. Suspension for any reason exceeding forty-five (45) calendar days shall, at the option of **DCE**, make this **AGREEMENT** subject to termination or renegotiation. All suspensions shall extend the time schedule for performance in a mutually satisfactory manner. In the event of suspension or termination, regardless of which party effects it, **DCE** shall be paid for services performed and charges prior to the suspension date, plus suspension charges.

10/03/01  WED 17:59 FAX 3054  923      DeSimone Consulting Er      305 534 5531      P.9      Ø008

# DCE

THE BENTLEY BAY
SPECIAL INSPECTION SERVICES
DCE PROPOSAL NO. 1585

PAGE 8 OF 9

---

### H.    FEE SCHEDULE

The following is our 2001 standard schedule of professional fees for Additional Services and for services rendered on Time and Expense projects. This schedule is subject to review and adjustment on the first of each year.

1.    PROFESSIONAL PERSONNEL:

| Classification | Hourly Rate |
|---|---|
| Senior Principals | $225.00/hr. |
| V.J. DeSimone | |
| J.E. Chaplin | |
| C.M. Dobryn | |
| Project Directors | $175.00/hr. |
| Field Operations Manager | $158.00/hr. |
| Senior Project Manager | $150.00/hr. |
| Project Manager | $140.00/hr |
| Senior Project Engineer | $120.00/hr. |
| Project Engineer | $105.00/hr. |
| Technical | $ 98.00/hr |
| Engineering Computer Time | No Charge |
| CAD Manager | $158.00/hr. |
| Senior CAD Operators | $120.00/hr. |
| CAD Operators | $105.00/hr. |
| CAD Computer Time | No Charge |
| Clerical | No Charge |

2.    SUBCONTRACTORS:

Subcontracted costs requested and authorized in writing such as borings, surveys, consultants, equipment, etc., will be charged at cost plus 15%.

3.    OTHER NON-SALARY EXPENSES:

Reimbursable expenses, such as printing, film and microfilm, long distance calls, messenger, express mail, travel, transportation and lodging, etc., will be invoiced at 1.10 x cost. Mileage on company or employee owned vehicles will be invoiced at $0.35/mile. Electronic CAD plotting will be invoiced at the rate of $2.60/SF (vellum), $2.10/SF (bond) and $4.10/SF (mylar). CAD plotting is invoiced only on benchmark issues, on issues specially requested by owner and owner's team and on plotting of electronically transmitted drawings from other consultants. There is no charge for in-house plotting for all other purposes. Local facsimiles, calls and in-house xeroxing will be provided at no cost. We will invoice you monthly and expect to be paid within 30 days.

10/03/01   WED 17:59 FAX 3054570023        DeSimone Consulting En                    009

THE BENTLEY BAY
SPECIAL INSPECTION SERVICES
DCE PROPOSAL NO. 1585

DCE

## I.    OTHER PROVISIONS

DCE's duties and obligations under this AGREEMENT may not be assigned by it; however with the approval of CLIENT, DCE may employ suitably trained and skilled persons or firms under subcontract to perform any part of the said duties and obligations.

All legal actions by either party against the other for breach of this AGREEMENT, or for the failure to perform in accordance with the applicable standard of care, however denominated, shall be barred two (2) years from the time claimant knew or should have known of its claim, but, in any event, not later than four (4) years from the substantial completion of DCE's services described in Exhibit I.

Any information or notices required or permitted under this AGREEMENT shall be deemed to have been sufficiently given to either party if delivered either by facsimile, personally or by certified mail to the address shown on the face hereof.

## J.    INTEGRATION

This AGREEMENT comprises a final and complete repository of understanding between the CLIENT and DCE. It supersedes all prior or contemporaneous communications, representations, or agreement, whether oral or written with respect to the subject matter of this AGREEMENT. No agreement hereafter made between the parties shall be binding on either party unless reduced to writing and signed by an authorized officer of the party sought to be bound thereby.

*( 70 Jul·  riolmi left )*

## CITY OF MIAMI BEACH
## BUILDING DEPARTMENT

### APPENDIX 11

1700 Convention Center Drive, 2nd Floor                     Phone: (305) 673-7610
Miami Beach, Florida 33139                                  Fax: (305) 673-7857

## SPECIAL INSPECTOR

Date:  February 19, 2003

ATTENTION:  Building Official

I, the undersigned, a Professional Engineer ☒, Registered Architect ☐, registered in the State of Florida, have been retained by the owners: <u>Florida Development Association</u> of the property located at: <u>Bentley Bay, 540 West Avenue, Miami Beach, Florida</u>, to perform all the duties of a Special Inspector, as defined in Section 105 of the Florida Building Code.

This office will be responsible to the Building Official of the City of Miami Beach for the inspection of the structural elements of the building, including:

1.  All excavations, piling and foundations (Garage only).
2.  All reinforced concrete (North Tower-Level 6 and above, South Tower-Level 2 and above, Garage).
3.  All structural steel.
4.  Windows and sliding glass doors.
5.  Railings.

and will file written weekly reports for the same as to the progress, compliance or non-compliance with the plans and the Florida ;ding Code.  In the event of non-compliance the Building Official shall be notified immediately so that appropriate action can be taken.

All mandatory inspections, as required by the Florida Building Code, **MUST** be performed by the City of Miami Beach when the special inspector is hired by the owner.  The City building inspections must be called for on **ALL MANDATORY** inspections. Inspections performed by the special inspector hired by the owner are **IN ADDITION** to the mandatory inspections performed by the City.

Upon completion of the structure, I will submit to the City of Miami Beach a certificate of compliance with the South Florida Building Code and approved plans.

ENGINEER/ARCHITECT SIGNATURE & SEAL: *Steven M. Goldstein*

ENGINEER/ARCHITECT (PRINTED):  Steven M. Goldstein, P.E.

LICENSE NUMBER:  44423

PHONE NUMBER:  305-441-0755

BUILDING PERMIT NUMBER:  B0202261

OWNER/AGENT SIGNATURE: _____

OWNER/AGENT (PRINTED): _____

BUIDING DEPARTMENT, Accepted By: _____

DATE: _____

DCE00007

**EXHIBIT "B"**

**CITY OF MIAMI BEACH**
**BUILDING DEPARTMENT**

### APPENDIX 11

<u>Must bear Engineer/Architect original Signature and Raised Seal !!</u>

<u>Scope of work and/or type of inspection to be done:</u>

1. <u>Foundations:  Piles, pile caps, grade beams-for Garage.  (Tower foundations inspected by City of Miami Beach).</u>

2. <u>Reinforced Concrete:  North Tower-Level 6 and above, South Tower-Level 2 and above, Garage.  (Remainder inspected by City of Miami Beach).</u>

3. <u>Structural Steel – Elevator separator beams, dunnage beams.</u>

4. <u>Inspection of windows and sliding glass doors:  Metal to metal frame connections, installation and caulking of glass panels.  (Anchorage of assemblies to concrete and masonry is excluded – previously inspected by Threshold Inspector.)</u>

5. <u>Installation of balcony railings.</u>

DCE00008

Steven M. Gedstein
2-19-03

# DESIMONE CONSULTING ENGINEERS, P.L.L.C.

February 24, 2003

Roger Reyes
Project Manager c/o
Florida Development Association
510 Ocean Avenue
Miami Beach, FL 33139

RECEIVED
FEB 2 4 2003
BY:

Re:   The Bentley Bay, 540 West Avenue, Miami Beach
      Special Inspection for Balcony Railings
      DCE Project No.: 4056A

Dear Mr. Reyes:

At the specific request of Andrew Marshall, we are now inspecting the handrail installations on the Bentley Bay project. We propose to invoice this time on DCE Project Number 4056A, so that the time can be tracked separately from the window and sliding glass door inspections. Invoicing rates and terms will be the same for both projects.

Please indicate your acceptance of these terms and provide your authorization to proceed by signing below and returning a copy to us by fax. Thank you for the opportunity to continue working on the Bentley Bay project.

Yours very truly,

William R. O'Donnell, P.E.
Managing Partner

WOD/dhm

AUTHORIZED TO PROCEED:

_Andrew Marshall_
Signed

_FDA, PROJECT MGR._
Title

_26 Feb 03_
Date

Cc:   Andrew Marshall (305) 938-4218

p.1          305 534 5531          Bentley Bay          Feb 26 03 11:54a

EXHIBIT "C"

 Thornton·Tomasetti Group

November 30, 2005

Mr. Barry Mukamal
Plan Administrator for Florida Development Associates, Inc.
c/o Mr. Lee Weintraub
Becker & Poliakoff, P.A.
3111 Stirling road
Fort Lauderdale, FL 33312

RE:    BENTLEY BAY CONDOMINIUMS
       HURRICANE WILMA DAMAGE ASSESSMENT
       CONSULTING ENGINEERING SERVICES

Dear Mr. Weintraub:

We are pleased to offer this proposal to provide investigative consulting engineering services in
connection with the above-referenced project. The purpose of the investigation is to evaluate and
determine the cause of each instance of damage to the balcony rails caused by Hurricanes Katrina
and Wilma. These events revealed instances of various installation concerns including but not
limited to:

1.    Post embedment depths;
2.    Base-plate bolt cut-offs;
3.    Base-plate bolt welds;
4.    Cap rail connections;
5.    Required post inserts;
6.    Bottom securing bracket sizes (nomenclature uncertain)

The intent is to conduct a forensic examination of each component of the railing systems installed
at the Bentley Bay. The investigation shall include but not be limited to comparing all related
railing system shop drawings for each railing system installed at the Bentley Bay to the physical
installation by whatever appropriate means necessary, and report each instance where installation
is not completed in accordance with the shop drawings and provide a written report detailing
same. This shall include but not be limited to:

    a.    Post embedments are installed at the required depth
    b.    That base-plate bolts are installed correctly;
    c.    That base-plate bolt welds are properly completed;
    d.    That all cap rail connections are installed properly and at required intervals
    e.    That post inserts are of required size and installed correctly
    f.    That the bottom clips are of sufficient size to ensure the purpose they were meant
          to serve.
    g.    That the glass has been installed correctly.

Inconsistencies reported will be accompanied by a written opinion as to whether the
inconsistency compromises the structural integrity of the system or that it may remain as installed
as is. If it may remain installed, we will assist in obtaining the appropriate approvals from the

330 North Andrews Avenue • Suite 450 • Fort Lauderdale, Fl 33301 • 954.522.3600 • 954.522.3691 fax • www.TheTTGroup.com
Worldwide Divisions: Thornton-Tomasetti Engineers • LZA Technology • LZA Associates

EXHIBIT "D"



RE:    BENTLEY BAY CONDOMINIUMS
        HURRICANE WILMA DAMAGE ASSESSMENT
        CONSULTING ENGINEERING SERVICES
Page 2   November 30, 2005

governing authorities. All repair recommendation will be presented in a written report and accompanied by a scope of work together with sign and sealed drawings sufficient for permitting in accordance with the laws, rules and/or guidelines as may be set forth by the governing authorities. We will assist the Contractor in permitting by providing technical assistance as required

In order to provide our inspection portion of the services, the Owner shall provide or arrange to provide access to the balconies. Our billing shall for time and project related expenses shall be hourly and in accordance with the attached Exhibit "A". Billing shall be monthly with payment due within twenty (20) days of receipt of our invoice.

Until such time as we have developed a full understanding of the scope of the problems at the referenced project, we agree to provide the initial inspection services on an hourly basis with an estimated budget not exceeding $35,000 plus expenses. Once the inspections are completed, we will provide written scope and budget estimates for subsequent services.

The Thornton-Tomasetti Group, Inc. (TTG) Standard Conditions, which are attached hereto, are hereby made a part of this agreement.

Kindly indicate your acceptance by signing and returning this Agreement, keeping the enclosed copy for your records.

If you have any questions, please do not hesitate to call.

We are contracting with Florida Development Associates, Inc. (hereinafter "FDA") for the purposes of billing and payment, but we understand we will be directed in our work by Lee A. Weintraub and Becker & Poliakoff, P.A. as attorneys for FDA. We understand our work is pursuant to pending litigation and/or arbitration involving FDA and it is intended that, unless instructed otherwise, our work constitutes privileged and confidential work product of FDA's attorneys and all communications from our office should be directed to FDA's attorneys.

Very truly yours,

THORNTON-TOMASETTI GROUP, INC.

John W. Knezevich, PE
Vice President
LZA Technology Division

ACCEPTED AND AGREED TO:

By: _____
    Barry Mukamal,
    Plan Administrator for
    Florida Development Assoc., Inc.

Date: _____

Encl.: Exhibit "A", TTG Standard Conditions



## The Thornton-Tomasetti Group, Inc. (TTG)
### Standard Conditions for Investigation and/or Design Services

(1)    TTG will perform its services in accordance with the standards of skill and care generally exercised by other design firms in the same locale acting under similar circumstances and conditions. Client acknowledges that TTG's services will be rendered without any warranty, express or implied. Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Client or TTG.

(2)    To the fullest extent permitted by law, the Client shall hold harmless, defend and indemnify TTG and its consultants, and each of their owners, directors, employees, heirs, successors and assigns from any and all claims, suits, demands, damages, losses, judgments, payments, awards, and expenses arising out of the Client's negligence on this project; Contractor(s)' negligence in performing the work and/or supplying the materials; or the negligence of any other party relative to the project except that TTG shall be liable for claims, damages, losses, judgments and expenses due to the sole negligence of TTG, its owners, directors, employees and consultants.

(3)    TTG shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials in any form at the Project site, including but not limited to asbestos, asbestos products, polychlorinated biphenyl (PCB), or other toxic substances. To the fullest extent permitted by law, Client shall hold harmless, defend and indemnify TTG and its consultants, and each of their owners, directors, employees, heirs, successors and assigns from any and all claims, suits, demands, damages, losses, judgments, payments, awards, and expenses which directly or indirectly arise from or relate to this Project with respect to asbestos or any material containing asbestos or any disease directly or indirectly related to asbestos; or any act, error, or omission, professional or otherwise, involving the existence, use, detection, removal, elimination of or exposure to asbestos or any material containing asbestos.

(4)    If TTG is called upon by Client, or subpoenaed by any other person, to testify, in an action at law, equity, arbitration, or in a pre-trial hearing or conference, as to any work performed by anyone in connection with this project, TTG shall be paid by the Client for all time spent while testifying and preparing therefor in accordance with the rates set forth in the attached agreement.

(5)    TTG shall not have control or charge of, and shall not be responsible for, construction means, methods, techniques, sequences or procedures, for safety precautions and programs in connection with the work, for the acts or omissions of the Contractor, Subcontractors or any other persons performing any of the work, or for the failure of any of them to carry out the work in accordance with the Contract Documents.

(6)    The Client shall cause the Contractor responsible for construction of the work designed by TTG to indemnify TTG to the fullest extent permitted by law against risks which are not normally borne by the design professions in the form of AIA Document A-201 - General Conditions of the Contract for Construction (1987 Edition), Section 3.18. Client shall also cause Contractor to name TTG as an additional insured on Contractor's Comprehensive General Liability policy.

(7)    Drawings and specifications prepared by TTG as instruments of service are, and shall remain, the property of TTG whether the project for which they are made is executed or not. They are not to be used on other projects, extensions to this project or for completion of this project by others, except by agreement in writing and with appropriate compensation to TTG.

(8)    If the project is suspended or abandoned in whole or in part for more than three months, TTG shall be compensated for all services performed and expenses incurred prior to receipt of written notice from Client of such suspension or abandonment in an amount as determined in accordance with the provisions set forth in this Agreement, together with all reasonable termination costs and expenses.



(9)     Evaluation of the Owner's project budget, and/or estimates of construction cost, if included in TTG's Scope of Services, represent TTG's best judgment as a design professional familiar with the construction industry. It is recognized, however, that TTG does not have control over the cost of labor, materials, or equipment, over the Contractor's methods of determining bid prices, or over competitive bidding, market, or negotiating conditions. Accordingly, TTG cannot and does not warrant or represent that bids or negotiated prices will not vary from the project budget proposed, established or approved by the Owner, if any, or from any statement of probable construction cost or other cost estimate or evaluation prepared by TTG.

(10)    Review of shop drawing submittals, if included in TTG's Scope of Services, is not conducted for the purpose of determining the accuracy and completeness of details such as dimensions and quantities or for substantiating instructions for installation or performance of equipment or systems designed by the Contractor, all of which remain the responsibility of the Contractor to the extent required by the Contract Documents. TTG's review shall not constitute approval of safety precautions or of construction means, methods, techniques, sequences, or procedures. TTG's approval of a specific item shall not indicate approval of an assembly of which the item is a component. When professional certification of performance characteristics of materials, systems or equipment is required by the Contract Documents, TTG shall be entitled to rely upon such certification to establish that the materials, systems or equipment will meet the performance criteria required by the Contract Documents.

(11)    Periodic site visits, if included in TTG's Scope of Services, shall mean that TTG shall visit the site at intervals, appropriate to the stage of construction, or as otherwise agreed with Client in writing. The purpose of periodic site visits is to become generally familiar with the progress and quality of the work designed by TTG and to determine in general if such work is proceeding in accordance with the Contract Documents. TTG shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the work designed by TTG. On the basis of such on-site observations as an engineer, TTG shall keep Client informed of the progress and quality of the work designed by TTG and shall endeavor to guard the Owner against defects and deficiencies in such work of the Contractor.

(12)    Full time project representation services, if included in TTG's Scope of Services, shall mean that TTG shall endeavor to provide further protection for the Owner against defects in the work designed by TTG. The furnishing of such full-time project representation services shall not make TTG responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs. TTG shall not have control or charge of and shall not be responsible for the acts or omissions of the Contractor, Subcontractors, or any other persons performing any of the work. TTG shall not be responsible for the failure of the Contractor, Subcontractors or any other persons performing any work to carry out the work in accordance with the Contract Documents.

(13)    If the project is to be designed, bid and constructed according to a "fast track" schedule, the Client acknowledges that fast track scheduling precludes overall coordination and completion of each portion of the Contract Documents at the time of their issuance, requires subsequent revisions to the Contract Documents to effect the overall coordination and completion and requires corresponding construction change orders adjusting the contract sum.

(14)    It is expressly understood and agreed that, to the fullest extent permitted by law, TTG's liability arising from any claims, suits, demands, damages, losses, judgements, payments, awards, and expenses relating to the project, whether claimed by Client or any third party, shall be limited to and in no event exceed the lesser of 1) the fee received by TTG for services rendered on the project or 2) $50,000 and, to the fullest extent permitted by law, the Client shall hold harmless, defend and indemnify TTG and its consultants, and each of their owners, directors, employees, heirs, successors, and assigns from any and all such claims, etc., to the extent they exceed such limit.

(15)    The foregoing conditions are incorporated into any agreement under which services are to be performed by TTG for the Client. If any of TTG's Standard Conditions or portions thereof shall be adjudged null and void, it is agreed that the remaining Standard Conditions or portions thereof shall remain intact and be given full force and effect. These Standard Conditions shall not be construed to indemnify TTG for its own negligence if not permitted by law, or to provide for any indemnification which would, as a result thereof, make the provisions of these Standard Conditions void, or to eliminate or reduce any other indemnification or right which TTG has by law.

11-30-2004 L

## EXHIBIT "A"
## LIST OF HOURLY BILLING RATES
### *LZA Technology Division*

| TITLE | BILLING RATE |
|---|---|
| MANAGING PRINCIPAL | $290.00 PER HOUR |
| PRINCIPAL/SENIOR VICE PRESIDENT | $240.00 PER HOUR |
| VICE PRESIDENT | $210.00 PER HOUR |
| SENIOR ASSOCIATE | $185.00 PER HOUR |
| ASSOCIATE | $170.00 PER HOUR |
| SENIOR PROJECT DIRECTOR | $150.00 PER HOUR |
| PROJECT DIRECTOR | $135.00 PER HOUR |
| SENIOR ENGINEER/ARCHITECT/DESIGNER | $120.00 PER HOUR |
| ENGINEER/ARCHITECT/DESIGNER | $110.00 PER HOUR |
| SENIOR TECHNICIAN | $105.00 PER HOUR |
| TECHNICIAN | $90.00 PER HOUR |
| SENIOR DRAFTSPERSON | $105.00 PER HOUR |
| DRAFTSPERSON | $90.00 PER HOUR |
| TECHNICAL TYPIST | $75.00 PER HOUR |

NOTE:  (1)  All out-of-pocket expenses, such as travel, computer, long-distance telephone calls, printing, courier service, mailings, special consultants, etc., shall be billed at cost plus 10%.

(2)  Above rates based upon a forty (40) hour week. Rates effective until December 31, 2005.